## Case No. 13,961.

### THOMPSON et al. v. JEWETT.

[4 Leg. Gaz. 50.]

Circuit Court, E. D. Pennsylvania.    Feb. 5, 1872.

PATENTS—EQUIVALENTS—INVENTION IN SEVERAL PARTS—EFFECT OF DISCONTINUANCE OF PROCEEDINGS—ACQUIESCENCE—AFFIDAVITS.

1. A patent for "caustic alkali, encased or enveloped in a tight metallic integument or metallic casing," having been declared valid, the sale of a substance containing caustic alkali with oil or rosin mechanically distributed through, but not in chemical union with it, and enclosed in a metallic integument, is an infringement.

2. An averment in the bill that several re-issue patents were granted to the patentee in part imports also an averment that the invention consisted of "distinct and separate parts," and is prima facie sustained by the exhibition of the said patents alone.

3. The discontinuance of proceedings against a respondent for an infringement does not estop the complainant from bringing a second suit; there was no adjudication of any sort upon the merits.

4. The mere discontinuance of a suit, and forbearance to sue any of the parties thereto for the period of a year or more thereafter, are not to be construed into an acquiescence in the infringement complained of.

5. The affidavit annexed to the bill, that the patentee was the original and first inventor of the thing patented, can be made by the assignee of the patent as well as by the patentee himself.

[This was a bill in equity by George Thompson and the Pennsylvania Salt Manufacturing Company against James B. Jewett.] Motion for preliminary injunction.

McKENNAN. Circuit Judge.    The bill in this case sets up two patents, numbered 2570 and 2571. They are divisions and re-issues of letters patent [No. 15,957] granted to George Thompson, October 21st, 1856, and have been extended for seven years from October 21st, 1870. The complainants now move for a preliminary injunction to restrain the alleged infringement of 2571. They have shown the possession and enjoyment of the exclusive rights, secured by this patent, for upwards of fifteen years, and that its validity has been established by litigation in the circuit court for this circuit, in several cases determined in 1868 and 1871. Penn. Salt Manuf'g Co. v. Thomas [Case No. 10,956], decided October 2d, 1871. In the face of these facts, the affidavits presented by the respondent, denying the novelty of the invention claimed, cannot have the effect of impugning the complainants' title. So far as concerns the present motion, it must be treated as established.

The respondent has been engaged in the sale only of an article, enclosed in small metal cans, with printed labels on them, marked "Compound Condensed Lye," and thus he is alleged to have infringed the complainants' patent. He denies that the substance thus enclosed is caustic alkali, or that, as it is put up and prepared for the market, it is within the scope of the patent. If this denial is true, in either of its branches, the respondent is not an infringer.

The claim of the patent in question is for "caustic alkali, encased or enveloped in a tight metallic integument or metallic casing, substantially as described" in the specification. And it is thus described: "I have discovered that by enclosing or encasing caustic alkali tightly in metallic integuments or casings, the deliquescence may be prevented, and the caustic alkali may be preserved practically for any length of time, and transported without destruction or accident. When it is desired to prepare the article for family use only, I enclose in each metallic integument or casing such quantity of caustic alkali as it would be desirable to use in a family at each single occasion. And one mode which I adopted and found to answer well for enclosing the material in a metallic integument is to provide boxes or canisters of sheet iron, or other material, made tight at the joints with infusible cement or otherwise, and into these I force the caustic alkali in a molten state, until they are nearly or quite full. The lid is then pressed down, so as to exclude air or moisture, and is secured by cement or otherwise." The invention then consists of these constituents: 1st. Caustic alkali. 2d A metallic integument to enclose it, of such size as will contain a quantity of the alkali, which it may be "desirable to use in a family at each single occasion," and made air-tight by infusible cement, or other equivalent means.

Does the article shown to have been sold by the respondent embody these constituents of the complainants' invention? The substance contained in the cans is alleged to be a compound, produced by the thorough incorporation with the caustic alkali of oil and rosin, by which it is "rendered independent of any need for the exclusion of the air from it." The mode of putting it up is stated to be, first, to pour into the can a small quantity of oil or rosin, and then melted caustic alkali and oil, or oil and rosin, in alternate layers, until the can is nearly full, when the whole is stirred and mixed, is allowed to cool, and a finishing layer of oil and rosin is then poured on the top. This, it is claimed, is a substance materially different from the "concentrated lye" put up by the complainants, under their patent. The proofs presented on both sides do not sustain this position of the respondent. Taken altogether, they satisfactorily show, that the substance contained in the respondent's cans is caustic soda, with oil or rosin mechanically distributed through it, but not in chemical union with it. This is the result of careful analysis, and it is confirmed by the prompt

and palpable deliquescence of the contents of some of the cans, which were opened and exposed to the atmosphere during the hearing of this motion. And this is still further confirmed by the known incompatibility of these elements, without the presence of water. This "compound" then consists chiefly of caustic soda with oil and rosin intermixed, but not combined so as to form a new substance, or to change the peculiar properties of the alkali. Deriving its distinctive character from caustic soda—its predominant constituent—it must be regarded as substantially caustic soda. We have here then all the elements of the complainants' invention, viz.: Caustic soda, enclosed in a metallic integument, containing a quantity adapted to family use at one time, and secluded from the atmosphere by an impermeable cement.

It is urged, however, that the mode of excluding the air is essentially different from that indicated in the complainants' patent. The argument is perhaps more pertinent to another patent, set up in the bill, but not involved in this motion, than to the patent in question, which is for a product only, but it is not unworthy of a brief notice. In his specification, the patentee, as he was bound to do, describes a method of effectuating his invention, and he proposed to effect the exclusion of the air by the application of infusible cement to the joints of the cans, and by pressing down the lids and securing them by infusible cement or otherwise. But he does not limit himself to the use of infusible cement, or prescribe its exterior application as essential to the production of his invention. The specific object of the use of cement is to exclude the air. Obviously, then, it is its impermeability, not its infusibility, which is made available for that purpose. An infusible cement applied on the outside of the can may be of additional utility, but it does not change the fact, that the avowed and essential function of the cement is to protect the caustic soda from the effect of exposure to the air. Any method, analogous to that described in the specification, by which this is accomplished, is within the scope of the patent, and where there is this substantial identity of means and result, it is immaterial what sort of cement is employed, or whether it is applied inside or outside of the integument. There is no substantial difference in the product.

An objection is made to the allowance of the motion, founded upon an alleged material defect in the complainants' bill. The patent in question is one of the divisions of a re-issue of the original patent, and it is maintained that the bill must aver that each division was for a distinct invention. That a patent may be re-issued in divisions is unquestionable. By the act of 1836 and its sequents, the commissioner of patents is authorized, when a re-issue is applied for, to grant several patents for "distinct and separate parts of the thing invented." Whether the "thing invented" is susceptible of division into "distinct and separate parts" rests, primarily at least, in the judgment of the commissioner. When he has so decided, every presumption is in favor of the rightful exercise of his authority. This is a familiar rule, and has been often applied to the decisions of the commissioner. The re-issue of a patent then, in divisions, carries with it the intendment that the invention described in the original consisted of "distinct and separate parts." And it follows, that an averment in the bill that several re-issued patents were granted to the patentee imports also an averment that the invention consisted of "distinct and separate parts," and is prima facie sustained by the exhibition of the said patents alone. If the respondent desires to contest the divisibility of the invention, and the validity of the patents, the duty is upon him to present the question by appropriate and specific averments in his answer.

In 1868 and 1869, bills were filed in the circuit court by the Pennsylvania Salt Manufacturing Company, one of the complainants now, against several persons,—among them T. Chalkley Taylor, the patentee of the "Compound Condensed Lye," which has been exhibited at this hearing,—to enjoin them against the infringement of the complainants' patent. After some time and the taking of proofs in one of the cases, the bills were discontinued by the complainant, and these discontinuances are now urged as a bar to the present bill. That the complainants are not estopped by the record of these former suits is clear without argument to demonstrate it. Such estoppel is founded on the reason that the matters in controversy have been once judicially determined, and, therefore, cannot again be drawn into controversy between the same parties or their privies. But here there was no adjudication, of any sort, upon the merits, but the complainants withdrew their suits from the cognizance of the court before any hearing was had, or any conclusive decree could have been pronounced, which alone could have the effect of a record estoppel.

It is argued, however, that these acts of the complainants, and the delay in the bringing of this suit, are to be construed as acquiescence in and encouragement of the infringement complained of, and that the complainants are, therefore, estopped in equity. If these acts necessarily imported the significance claimed for them, and the respondent acted upon them, there would be force in the argument. But the mere logical interpretation of their conduct is, that they withdrew their suits for the very purpose of averting the estoppel of an adverse decision, not to indicate their acquiescence in the alleged invasion of their rights, and thereby disable themselves from seeking redress in the future. Nor do the further acts—or rather the nonaction—of the complainants strengthen the respondent's position. Mere abstention from the enforcement of a right is no authority for

its appropriation by another. There must be something more. Concealment of rights when they ought to be made known, or encouragement by one person to another to expend his money or alter his condition, upon the faith of which the latter has acted, are essential elements of such an estoppel as is set up here. In other words, the estoppel must rest upon such conduct of the complainants, upon the faith of which the respondent has innocently acted, that, to allow the former to enforce their right, would be a fraud upon the latter. Conceding that the respondent may fairly invoke the equities of the manufacturer, whose factor or agent he is, the affidavits presented do not show any such foundation for an estoppel. They do not show, that the rights claimed by the complainants were unknown to the respondent or his principal, or that they were induced by any act of the complainants to expend money, or in any wise to alter their condition. Their import is the converse of this. For it is apparent from them, that the complainants' patent was well known to the respondent's principal, when the suits referred to were brought; that he had before established the manufacture and sale of the infringing article; that he continued after the discontinuance of these suits, to manufacture and sell it, as before, without change, and that he claimed the right to do this under the patent of T. Chalkley Taylor, without reference to any act of the complainants. I cannot hold, therefore, that the complainants, by merely discontinuing their former suits, and forbearing to sue any of the parties thereto for a period but little more than a year thereafter, have thereby disabled themselves from maintaining this suit.

The last objection urged is, that the affidavit annexed to the bill and read at the hearing, that George Thompson is believed by the affiant to be the original and first inventor of the thing patented, is not verified by the patentee, but by the president of the other complainant. 2 Daniell, Ch. Prac. 1664, and Curt. Pat. § 408, are referred to in support of this objection. The first of these states the rule upon the authority of Hill v. Thompson, 3 Mer. 624, and the latter upon the authority of Rogers v. Abbott [Case No. 12,004], and Sullivan v. Redfield [Id. 13,597]. It originated with Lord Eldon, who first announced it in Hill v. Thompson [3 Mer. 622], as applicable only to ex parte applications for injunctions. So it was treated by Mr. Justice Thompson, in Sullivan v. Redfield [supra]. He there said: "The present case, however, cannot be considered as strictly within this rule. The application is not altogether ex parte. It is made on a notice of the motion, and has been resisted by counsel, and was open to the hearing of opposing affidavits." And he suggests it as proper to be adopted in all cases, where the bill does not allege the complainant to be the original inventor. However well supported by authority the rule may be, it cannot be considered as imperative in this case, where the bill contains an averment, that the patentee is the first and original inventor of the invention claimed, and the motion has been made upon notice, has been heard by counsel on both sides, and opposing affidavits have been presented by the respondent. But it is to be further observed, that, in all the cases the patentee was the complainant, that the requirement is to be understood as made upon him in his character as a party, and that they do not hold, that no one else, sustaining a like relation to the suit, is not competent to make the affidavit. Indeed where, as in this case, the patentee has assigned all his interest in the patent, and is only a nominal party, there seems to me to be special propriety in imposing this duty upon the assignee, who, for his own protection, invokes the intervention of the court.

Having exhibited a title to the invention described in the patent, which, for the present, must be treated as established, and, having shown infringement of their rights, the complainants are entitled to protection in some form. But that must be adequate, as well as considerate of the interests of the respondent, until the question of right can be finally determined. The complainants are engaged in the manufacture of the patented invention, and their profits arise from the monopoly of its sale. To this they are entitled if to anything. The competition of the respondent may be highly injurious to their rights, and this is the injury complained of. An order merely, that respondent keep an account of his sales, and give bond to secure the payment of the profits, would not, therefore, prevent the mischief. The appropriate and only sufficient remedy is to restrain him. An injunction, until final hearing or further order, must, therefore, be ordered.

[For other cases involving this patent, see note to Pennsylvania Salt Co. v. Gugenheim, Case No. 10,954.]

